Richard G. Fritsche,

       Plaintiff,

       v.                                Case No. 2:12-CV-123-JVB

Michael J. Astrue,
Commissioner of Social Security
Administration,

       Defendant.

## OPINION AND ORDER

Plaintiff Richard G. Fritsche seeks judicial review of the final decision of Defendant

Michael J. Astrue, Commissioner of Social Security, who partially denied his applications for

Disability Insurance Benefits and Supplemental Security Income disability benefits under the

Social Security Act. For the following reasons, the Court remands this case to the Social Security

Administration for further proceedings consistent with this Opinion.

## A. Procedural Background

Plaintiff applied for Disability Insurance Benefits ("DIB") and Supplemental Security

Income disability ("SSI") benefits in 2008, alleging disability beginning on July 23, 2007. (R. at

177–184.) His claims were denied initially on April 25, 2008 (R. at 75–76), as well as upon

reconsideration on August 8, 2008 (R. at 77–78). On September 19, 2008, Plaintiff requested a

hearing with an Administrative Law Judge ("ALJ"). (R. at 119–122.) His hearing was held

before ALJ Dennis R. Kramer on August 11, 2010. (R. at 11–74.) On September 25, 2010, the

ALJ determined that Plaintiff had been disabled, but only since July 2, 2010, not since the alleged onset date in 2007. (R. at 79–99.) The ALJ's opinion became final when the Appeals Council denied Plaintiff's request for review on January 25, 2012. (R. at 1–5.)

**B. Factual Background**

**(1)** *Plaintiff's Background and Testimony*

Plaintiff was born in 1969. (R. at 16.) His highest level of education was a GED (R. at 350), plus some job-related training (R. at 19, 21-22). Since the alleged onset date of July 23, 2007, Plaintiff's only income was short-term disability payments of $14,370 in 2008. (R. at 13–14, 17–18.) Previously, from 1993 to 1999 and 2006 to 2007, Plaintiff operated and supervised screw manufacturing machines. (R. at 19–20, 350.) He lifted up to 150 pounds and stood bent over the machines for ten hours per day, other than sitting during breaks and lunch. (R. at 20–21, 350.) From 2001 to 2006, Plaintiff worked as a mail carrier. (R. at 18, 350.) He stood for a few hours each day to sort mail manually, after which he drove and walked a mail delivery route, lifting up to seventy pounds. (R. at 18–19.) From 1999 to 2000, Plaintiff performed maintenance at a trailer park, including plumbing, lawn mowing, pool cleaning, power washing, cutting fallen trees with a chainsaw, and lifting up to 100 pounds. (R. at 22–23.) He also did part-time maintenance at an assisted living facility from 2002 to 2003. (R. at 350.)

Plaintiff claimed his disability began and he stopped working on July 23, 2007, because he "was in extreme pain," particularly in his back. (R. at 27.) Over the next three years, Plaintiff tried multiple medical treatments, but none relieved his pain. (R. at 27–29.) His medical options were limited by inconsistent and, ultimately, nonexistent insurance coverage. (R. at 36, 44.) In

May 2010, Plaintiff fell in the bathroom, which prompted his doctor to prescribe a cane on July 2. (R. at 30.) He claimed to have used the cane at home constantly since that summer. (R. at 30).

Plaintiff further testified that he could not sit for more than a half hour to an hour at a time (R. at 30) or stand still for more than ten to fifteen minutes (R. at 38). He usually walked up to one block with his cane, but he could walk longer—up to forty-five minutes—at a slow pace if shopping with a cart. (R. at 30–31, 39.) His parents typically accompanied him to help with the shopping. (R. at 39.) Plaintiff said he could lift and carry up to ten pounds, but he did not think himself capable of doing so while on his feet for one- to two-thirds of an eight-hour workday. (*Id*.) He also denied the abilities to kneel, squat, balance, bend to touch his toes, extend his arm past 110 degrees, or climb a flight of stairs, but he could climb the two stairs into his house. (R. at 39–40.) Plaintiff explained that he could drive, but pressing the pedals caused shooting pain up his right leg and into his back. (R. at 32.)

At the August 11, 2010, hearing, Plaintiff asserted that his present pain was at ten out of ten and that it reached that level every day. (R. at 29.) In fact, he said he always had pain, and it became so distracting that he could not sit through an hour-long television show without getting up to walk around. (R. at 41–42.) He described his leg problems as numbness and tingling, which were present 90% of the time and made worse by activity such as walking. (R. at 43.) Additionally, Plaintiff reported "migraines" occurring two to three times per day for the past year with pain at a level ten out of ten until an hour after taking headache medicine. (R. at 33.) He claimed to suffer from severe asthma, which he managed with inhalers and allergy medication, despite working for years in factories and outdoors. (R. at 33–34.) He also discussed taking medicines for sleeping difficulties, depression, and gastroesophageal reflux disease. (R. at 35–38.)

Plaintiff's father, Richard Fritsche, Sr., testified at the hearing that he had observed Plaintiff over the past two years while they lived together. (R. at 45–48.) He said Plaintiff typically read, watched television, walked on the deck, or went shopping with his parents. (R. at 46–47.) He explained that Plaintiff used his cane constantly, had limited movement, expressed pain on his face, and often complained about headaches, tingling legs, and the implanted back stimulator. (R. at 46–48.)

### (2) *Medical Evidence*

Plaintiff claimed that his severe, medically determinable impairments were asthma, allergic rhinitis and episodes of acute upper respiratory infections, gastroesophageal reflux disease, depression, and a variety of back problems. (R. at 350–351.)

Plaintiff first injured his back by falling in December 2006 and February 2007, and the pain allegedly remained despite medications and three lumbar epidural steroid and trigger point injections in July and August 2007. (R. at 350, 477–490.) After performing a lumbar myelogram in July 2007, Dr. Bahzad Aalaei diagnosed Plaintiff with spinal stenosis and herniated discs at L4–L5. (R. at 492–493.) In September 2007, Plaintiff underwent a provocative discogram, after which Dr. Aalaei confirmed that the source of Plaintiff's pain was at L3–L4, L4–L5, and L5–S1 and found a posterior epidural leak. (R. at 470–471.)

In October 2007, Plaintiff had back surgery, including a 360-degree fusion with instrumentation from L3 to S1, stimulator implantation, bone graft, and discectomy. (R. at 438–441.) The surgeon, Dr. Donald W. Kucharzyk, diagnosed Plaintiff with two conditions: (1) multilevel lumbar spondylosis with spondylotic segmental instability, neural foraminal lateral

recess stenosis, facet arthropathy, spondylotic segmental instability, spondylotic herniated nucleus pulposus at L3–L4, L4–L5, and L5–S1, and lumbosacral radiculopathy; and (2) postlaminectomy instability syndrome at L3–L4, L4–L5, and L5–S1. (R. at 438.)

Plaintiff reinjured his back two months after the surgery, in December 2007, by running up the stairs to respond to his screaming children. (R. at 351.) His renewed back pain sent him to the emergency room twice in the next two days. (R. at 407–420.) Plaintiff used a walker for four months after the surgery, followed by a cane for standing and walking. (R. at 350–351.)

On April 25, 2008, State agency physician Dr. Mangala Hasanadka completed a residual functional capacity ("RFC") assessment. (R. at 453–460). He determined that Plaintiff could occasionally lift or carry up to twenty pounds; frequently lift or carry up to ten pounds; stand, walk, or sit each up to six of eight working hours; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and never climb ladders, rope, or scaffolds. (R. at 454–455.) He also found no manipulative, visual, communicative, or environmental limitations. (R. at 456–457.) Thereafter, Dr. J. Sands reviewed Plaintiff's file and affirmed Dr. Hasanadka's assessment without any further explanation. (R. at 461.)

On July 25, 2008, treating physician Dr. Surendra J. Shah opined that Plaintiff's RFC precluded all gainful employment because he had significant limitations in grasping and manipulation, pushing and pulling, bending, squatting, crawling, and climbing; moderate limitations in sitting, standing, walking, lifting, repetitive leg movements, and normal housework; and no significant limitations in reaching above his shoulders, being around machinery, driving, exposure to temperature and humidity changes, exposure to dust, fumes, or gases, and caring for personal needs. (R. at 610–611.) Dr. Shah claimed that Plaintiff could not work due to pain and that his limitations would not improve with medical care. (R. at 610.)

On July 2, 2010, Family Nurse Practitioner Jaime C. Harris prescribed Plaintiff an adjustable aluminum cane. (R. at 584.) Thereafter, at the August 11, 2010, hearing, Plaintiff complained that his implanted back stimulator was not working, and he hoped it would be removed soon. (R. at 44.) Plaintiff's medications at that time included Tramadol, ibuprofen, and acetaminophen for pain; Trazodone for depression; Singulair, Flonase, and Claritin for allergies; Proventil for asthma; Pravastatin for cholesterol; and Prilosec for gastroesophageal reflux disease. (R. at 613.) He claimed his side effects were tiredness, migraines, headaches, dizziness, loss of balance, frequent urination, and achiness. (R. at 614.)

**(3)** *Medical Expert's Testimony*

Medical expert Dr. James McKenna ("ME"), an internist and pulmonologist (R. at 48), testified at Plaintiff's August 11, 2010, hearing before the ALJ (R. at 48–64). The ME opined that Plaintiff's severe impairments were degenerative disc disease, annular tears or fissures at L3, L4, L5, and S1, and neuroforaminal herniation at L3-L4 and L5-S1. (R. at 49.) He discussed at length Plaintiff's October 31, 2007, back surgery, which included a discectomy, fusion, and insertion of a stimulator. (R. at 49–52.) He described such surgery as "a big deal" (R. at 61), although Plaintiff's was "technically a success" (R. at 59) without residual central spinal stenosis or neuroforaminal stenosis (R. at 51–52). For that reason the ME could not medically explain Plaintiff's ongoing back and leg problems beyond the short-term pain of the surgical cutting and "the foreign body effect" of the screws and hardware. (*Id*.) He described Plaintiff's allegations as "a kind of superimposed chronic pain syndrome which is in excess of the affective medical evidence in file." (R. at 52.) Likewise, the ME commented that Plaintiff's "very generous" use of

the ten out of ten pain description was "an abuse of the term," which made Plaintiff less reliable because he was "given to hyperbole." (*Id*.) The ME also saw no objective medical need for a cane. (R. at 55.)

Along with the back problems, the ME recognized Plaintiff's asthma and allergic rhinitis, which were controlled by medication but likely worsened by working in factories and moving from the Midwest to Georgia, where plants pollinate "aggressively" and for longer seasons. (R. at 53.) These issues likely produced Plaintiff's headaches, which the ME characterized as "sinus style headaches" because "if they last for short periods of time and come and go like that, that's not a migraine." (*Id*.) The related breathing problems could have affected Plaintiff's sleep, potentially causing sleep apnea. (R. at 54.)

The ME reduced the State agency physicians' RFC from light to sedentary to accommodate Plaintiff's chronic pain syndrome. (R. at 54–55.) Specifically, he opined that Plaintiff could lift and carry ten pounds occasionally and five to six pounds frequently; could sit for seven hours, stand for two hours, and walk for two hours in an eight-hour workday; should have a sit-stand option; could occasionally climb ramps, climb stairs, balance, stoop, kneel, crouch, crawl, reach overhead, push or pull with both hands, operate foot controls with both feet, and be exposed to unprotected heights, moving mechanical parts, dust, odors, fumes, pulmonary irritants, extreme cold, and vibrations; could frequently reach in all directions except overhead, handle, finger, and feel with both hands, and be exposed to operating a motor vehicle, humidity, wetness, and extreme heat; could be exposed to loud (heavy traffic) noise; and should never climb ladders or scaffolds. Additionally, Plaintiff could do daily activities like shopping; traveling without a companion for assistance; ambulating without a wheelchair, a walker, two canes, or two crutches; walking a block at a reasonable pace on rough or uneven surfaces; using

standard public transportation; climbing a few steps at a reasonable pace with a single hand rail; preparing a simple meal and feeding himself; caring for personal hygiene; and sorting, handling, and using paper or files. (R. at 54–57, 616–21.)

Finally, the ME agreed that "if he had insurance it [Plaintiff's medical testing and treatment] could be handled differently." (R. at 63.) For example, Plaintiff likely would have had an MRI, CT scan, and EMG. (R. at 63–64.) And "if he went to one of the other high powered pain centers they would do, first of all, diagnostic blocks for the pain" and "a high frequency ablation of those particular nerve areas" so he "would permanently just be numb but he wouldn't have any pain there." (R. at 63.) Nonetheless, the ME maintained that Plaintiff's RFC should be sedentary, which he reduced from light only because of the chronic pain syndrome. (*Id.*)

**(4)** *Vocational Expert's Testimony*

Vocational expert Thomas Grzesik ("VE") testified at Plaintiff's August 11, 2010, hearing before the ALJ. (R. at 64–71.) The VE classified Plaintiff's former jobs of screw machine set up operator and supervisor as skilled and very heavy, mail delivery person as semi-skilled and heavy (R. at 65), and mobile home maintenance person as skilled and heavy (R. at 65–66).

The ALJ provided the VE with five hypotheticals to evaluate, all which included Plaintiff's 41 years of age, GED education, and work experience. (R. at 66–71.) The first scenario also incorporated the limitations from the ME's RFC assessment. (R. at 66–68, 615–622; *see infra* at 7–8.) The VE opined that, under these facts, Plaintiff could not perform his past work, which was very heavy or heavy and skilled or semi-skilled, but he could perform

sedentary, unskilled work. (R. at 68.) Examples of positions in northwest Indiana were call out operators (8,000 existing jobs), information clerks (8,000 existing jobs), and order clerks (1,000 existing jobs). (*Id.*)

For the second hypothetical, the ALJ added the use of a cane when walking or standing. (*Id.*) The VE explained that this extra limitation would prevent Plaintiff from doing substantial gainful employment because he would need to use the cane while on his feet for one hour of the workday. (R. at 68–69.) Another hypothetical built on the first but with a different variable: headache pain lasting one hour at the maximum ten out of ten in severity, up to three times per day. (R. at 71.) The VE determined that this, too, would preclude all employment.

Next, the ALJ proposed a hypothetical with the restrictions from treating physician Dr. Surendra J. Shah's RFC assessment. (R. at 69–70, 611; *see infra* at 5.) These included significant limitations on grasping and manipulation, pushing and pulling, bending, squatting, crawling, and climbing, plus multiple moderate limitations. (*Id.*) The VE opined that a significant limitation—the most severe on this scale—in grasping and manipulation was sufficient by itself to preclude all employment for Plaintiff. (R. at 70.)

Additionally, the ALJ proposed a hypothetical corresponding with Plaintiff's subjective view of his pain and limitations, as described during the hearing. (R. at 70–71.) The VE again concluded that there would be no jobs for Plaintiff in such a state. (R. at 71.) Notably, the ALJ confirmed that the VE's reason for finding no work in this scenario was because of the cane used for standing and walking, as in the second hypothetical. (*Id.*)

**(5) *ALJ's Decision***

On September 25, 2010, the ALJ issued a partially favorable decision that Plaintiff was disabled as of July 2, 2010—not the alleged onset date of July 23, 2007. (R. at 94.) The ALJ determined that, since the alleged onset date, Plaintiff had multiple severe impairments: disorders of the back and degenerative disc disease; annular tears at L3-L4, L4-L5, L5-S1; being status-post lumbar surgery; migraine headaches; a left side herniation; asthma; gastroesophageal reflux disease; and chronic pain syndrome. (R. at 85.) Nonetheless, these did not meet any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1. (R. at 86.)

The ALJ further found that Plaintiff had not engaged in substantial gainful activity since July 23, 2007 (R. at 85), nor was he able to perform his past relevant work since then (R. at 92). Still, the ALJ determined that he could have performed sedentary work with the exceptions listed by the ME[1], *see infra* at 7–8, until July 2, 2010 (R. at 86–87, 621). Until that date, jobs existed in significant numbers in the national economy that Plaintiff could have performed. (R. at 92–93.) However, beginning July 2, 2010, Plaintiff's RFC gained an additional limitation: using a cane for standing and walking. (R. at 91–92.) This change prompted the ALJ to conclude that no jobs existed in significant numbers in the national economy that Plaintiff could perform as of July 2, 2010, (R. at 93), so he became disabled then (R. at 94).

## C. Standard of Review

This Court has the authority to review Social Security Act claim decisions under 42

---

[1] The ALJ's RFC assessment varied from the ME's in only one respect, which appears to be a mere typographical error. The decision listed Plaintiff's workday limitations as sitting for seven hours, standing for two hours, and sitting for two hours. (R. at 86.) After considering this patent ambiguity's context within the decision and the ALJ's otherwise mirror image of the ME's RFC assessment (*see* R. at 615–622), the Court concludes that the ALJ must have meant for the two-hour sitting limitation to be a two-hour walking limitation.

U.S.C. § 405(g). The Court will uphold an ALJ's decision if it is reached under the correct legal standard and supported by substantial evidence. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This Court will not reconsider facts, re-weigh the evidence, resolve conflicts in the evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). This Court will, however, ensure that the ALJ built an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may access the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002).

**D. Disability Standard**

To qualify for DIB or SSI benefits, the claimant must establish that he suffers from a disability. A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security Administration ("SSA") established a five-step inquiry to evaluate whether a claimant qualifies for disability benefits. A successful claimant must show:

> (1) he is not presently employed; (2) his impairment is severe; (3) his impairment is listed or equal to a listing in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) he is not able to perform her past relevant work; and (5) he is unable to perform any other work within the national and local economy.

*Scheck v. Barnhart,* 357 F.3d 697, 699–700 (7th Cir. 2004).

An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter,* 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford v. Apfel,* 227 F.3d 863, 868 (7th Cir. 2000).

**E. Analysis**

Plaintiff asserts two primary issues upon appeal: (1) whether the ALJ legally erred in his assessment of Plaintiff's RFC; and (2) whether the ALJ legally erred in his assessment of Plaintiff's credibility. (DE 14 at 11, 19.)

As to credibility, the ALJ

[a]fter careful consideration of the evidence, . . . f[ou]nd that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible prior to July 2, 2010, to the extent they are inconsistent with the [RFC] assessment.

(R. at 88.) He also concluded that, before July 2, 2010, Plaintiff had an RFC to perform sedentary work with numerous postural, environmental, and activity limitations. (R. at 86–87.) As of July 2, 2010, Plaintiff's RFC gained an additional limitation of using a cane when standing or walking. (R. at 91–92.) This change prompted the ALJ's partially favorable decision that Plaintiff was disabled as of July 2, 2010. (R. at 92.)

This Court must decide whether the ALJ's credibility and RFC assessments were reached under the correct legal standard and supported by substantial evidence—that is, evidence that is relevant and reasonably adequate to support the ALJ's conclusions. *See*

*Briscoe*, 425 F.3d at 351; *Richardson*, 402 U.S. at 401. For the reasons explained below, the Court remands this case to the SSA for further proceedings consistent with this Opinion.

**(1)** *The ALJ legally erred in his assessment of Plaintiff's RFC.*

Plaintiff claims the ALJ legally erred in his assessment of Plaintiff's RFC because he failed to give controlling weight to treating physician Dr. Shah, improperly gave great weight to State agency reviewing physicians Drs. Hasanadka and Sands and to ME Dr. McKenna, and failed to properly account for Plaintiff's migraine headaches and depression. (DE 14 at 11–18.) The Court finds the ALJ justified his decision about Plaintiff's depression with substantial evidence, but he failed to explain the great or little weight given to the physicians' opinions on the other medical issues. Therefore, the ALJ must address on remand: (1) why he concluded each doctor's opinion was or was not consistent with the evidence as a whole; (2) what made the objective medical evidence "relatively unremarkable;" and (3) whether Plaintiff's headaches were migraines.

(a) *Lack of evidence to support the ALJ's RFC conclusion*

Plaintiff's objection that the ALJ should have given great weight to Dr. Shah's opinion— not to the opinions of the non-treating physicians—requires remand. "An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v.*

*Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). In order to reject a treating doctor's opinion, the

ALJ need only find contrary "substantial evidence," which is "'more than a scintilla' but less

than a preponderance of the evidence, and is 'such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.'" *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir.

2001) (citations omitted).

However, this Court cannot determine whether there was substantial evidence to uphold

the ALJ's RFC determination because he gives virtually none to evaluate. The only support for

his conclusion—that the opinions of Drs. McKenna, Hasanadka, and Sands merited "great

weight" because they were "consistent with, and supported by, the objective evidence in this

matter"—was a mere recitation of each doctor's RFC assessments. And although the ALJ

systematically went through the evidence on each medical condition earlier in the decision (R. at

88–90), he needed to build an "accurate and logical bridge from th[at] evidence to his

conclusion[s]" on the conflicting RFC analyses, *see Scott*, 297 F.3d at 595. The missing link that

the ALJ must provide on remand is what subjective and objective evidence aligns with or

diverges from those analyses to justify accepting some and rejecting others. Even if the ALJ

continues to disregard Dr. Shah's RFC recommendations as less credible (R. at 91), he must also

explain why he chose to follow the recommendations of Dr. McKenna (limited sedentary work)

over those of Drs. Mangala and Sands (limited light work), when their opinions carried equally

"great weight" for him. (R. at 90–91.)

Regarding the specific medical issues, the ALJ did explain why he rejected Plaintiff's

allegedly severe asthma: because "Dr. Shah admitted that the claimant's asthma was merely

moderate," citing to that doctor's July 2008 RFC assessment. (R. at 91, 344, 607.) But then he

failed to mention any other facts from the record which would discredit the rest of Dr. Shah's

opinions, particularly about Plaintiff's alleged debilitating back pain, leg tingling, and lifting and postural limitations. This lack of explanation does not equal a lack of evidence, contrary to Plaintiff's assertions. (DE 14 at 11–12.) In fact, the ALJ was only required to seek more information from Dr. Shah pursuant to 20 C.F.R. § 1512(e) if "the evidence received [wa]s inadequate to determine whether the claimant [wa]s disabled." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Evidence is "inadequate" if ambiguous, outdated, or insufficient in quantity or detail. *Sutton v. Barnhart*, 183 Fed. Appx. 555, 560 (7th Cir. 2006) (citations omitted). To hold otherwise would inappropriately shift Plaintiff's burdens of production and proof to the ALJ. *Id.*; 20 C.F.R. § 1512(a), (c). On remand, the ALJ must state which facts from the record were sufficient to reach his conclusions, thereby rendering it unnecessary to recontact Dr. Shah.

In contrast with the obvious explanatory gaps regarding the RFC analyses, the ALJ addressed Plaintiff's depression in detail with many facts from the record. (R. at 86, 90.) He effectively explained that it was not a severe impairment because Plaintiff did "not have any documented history of even outpatient mental health treatment, and he is merely being prescribed a depression medication, apparently successfully." (R. at 86.) Because Plaintiff did not claim any mental difficulties other than some distracting pain, the ALJ concluded he had mild or no limitations in activities of daily living; social functioning; concentration, persistence, and pace; and episodes of decompensation. (*Id.*) He then reasoned that "all of the jobs that the impartial vocational expert credibly opined that the claimant could perform prior to [July 2, 2010,] were unskilled jobs, which would more than appropriately accommodate any minor concentration issues secondary to pain." (R. at 90.) On remand, the ALJ should follow this model of a logical bridge connecting the evidence (here, Plaintiff's concentration issues from

depression) to his conclusions (here, limiting Plaintiff to unskilled work) for the other alleged medical issues. He need not readdress the depression because that conclusion was supported by substantial evidence.


(b) *Lack of explanation of the "relatively unremarkable objective evidence"*

While the ALJ is revisiting his treatment of the conflicting RFC analyses, he must also explain what made the objective medical evidence "relatively unremarkable" (R. at 91), leading him to conclude that Plaintiff was not disabled until he got a prescription cane on July 2, 2010 (R. at 92). The ALJ's revised explanation should clarify his use of that phrase, especially in light of Plaintiff's claimed chronic pain since July 23, 2007 (R. at 27–29, 41–42, 351); October 2007 fusion back surgery, which the ME called "a big deal" (R. at 61); use of a walker or cane since that surgery (R. at 350–351); subsequent emergency room visits for allegedly reinjuring his back in December 2007 (R. at 613); multiple medications for pain and other conditions (R. at 613–614); and limited testing and treatment records because of lapsed insurance (R. at 36, 44). As to insurance, the ALJ should consult SSR 96-7p, which requires him to consider that "[t]he individual may be unable to afford treatment and may not have access to free or low-cost medical services" before deeming Plaintiff's subjective assertions not credible due to lack of objective supporting evidence. Even the ME—whose opinion the ALJ gave "great weight" to (R. at 90)—agreed that "if he had insurance it could be handled differently" (R. at 63).

(c) *ALJ's contradictory discussion of Plaintiff's headaches*

On remand the ALJ also needs to clarify whether Plaintiff's headaches are "migraines" because his decision was contradictory. He first declared that Plaintiff's "migraine headaches" were "severe impairments" since the alleged onset date of July 23, 2007. (R. at 85.) Then, a few pages later, the ALJ lauded "Dr. McKenna's highly credible testimony at the hearing that the claimant's alleged headaches do not appear to be migraine headaches" (R. at 91) but rather are "sinus style headaches" because "if they last for short periods of time and come and go like that, that's not a migraine." (R. at 53.) If Plaintiff's headaches are indeed "migraines," then the ALJ must explain why he gave "great weight" to the ME's testimony (R. at 90), except on this issue.

**(2)** ***The ALJ legally erred in his assessment of Plaintiff's credibility.***

Plaintiff claims the ALJ legally erred in his assessment of Plaintiff's credibility because he gave "a boilerplate credibility determination that relie[d] only on objective evidence," including the testimony and RFC analysis of the ME. (DE 14 at 19–21.) Plaintiff asserts that the ALJ failed to sufficiently consider testimony from Plaintiff and his father regarding the alleged severity of Plaintiff's pain and its effects on his activities of daily living. (*Id.*) The Court agrees and finds that the ALJ did not adequately support his boilerplate statement with specific facts from the record, particularly regarding subjective evidence, before concluding that Plaintiff's complaints were not entirely credible.

In recent years, the Seventh Circuit has criticized SSA ALJs for the use of "opaque" and "meaningless" boilerplate in decisions denying disability benefits without articulating specific factual support. *Bjornson v. Astrue*, 671 F.3d 640, 644 (7th Cir. 2012); *Parker v. Astrue*, 597 F.

3d 920, 922 (7th Cir. 2010). But "[w]hile this sort of boilerplate is inadequate, *by itself*, to support a credibility finding, . . . its use[ ] does not make a credibility determination invalid. Not supporting a credibility determination with explanation and evidence from the record does." *Adams v. Astrue*, 880 F. Supp. 2d 895, 906 (N.D. Ill. 2012) (emphasis in original) (citing *Richison v. Astrue*, 462 Fed. Appx. 622, 625 (7th Cir. 2012); *Punzio v. Astrue*, 630 F.3d 704, 709 (7th Cir. 2011)).

The Seventh Circuit has also clarified that, "[b]ecause the ALJ is in the best position to observe witnesses, we will not disturb [their] credibility determinations as long as they find some support in the record." *Dixon*, 270 F.3d at 1178–79; *see also Brown v. Astrue*, 2012 U.S. Dist. LEXIS 129202, *31 (N.D. Ind. Sept. 11, 2012). Likewise, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (citation omitted). "Patently wrong" is a high burden. *Turner v. Astrue*, 390 Fed. Appx. 581, 587 (7th Cir. 2010). "An ALJ's credibility determination need not be flawless." *Adams*, 880 F. Supp. 2d at 905 (citing *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2008)). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be 'patently wrong' . . . and deserving of reversal." *Elder v. Astrue*, 529 F.3d 408, 413–414 (7th Cir. 2008) (citations omitted).

Here the ALJ determined that Plaintiff had the RFC to perform sedentary work with a multitude of exceptions, later adding the requirement that Plaintiff use a cane while walking and standing as of July 2, 2010. (R. at 86–87, 91–92.) The ALJ summarized his credibility findings using the boilerplate language:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible prior to July

2, 2010, to the extent they are inconsistent with the [RFC] assessment.

(R. at 88.) The issue is, thus, whether the ALJ supported this statement with an explanation and sufficient evidence from the record, and the Court finds that he did not.

The ALJ's credibility determination was patently wrong in part where it "lack[ed] any explanation or support," *see Elder*, 529 F.3d at 413–414, for its dismissal of Plaintiff's subjective complaints. Especially in this case with a limited objective medical record due to lapsed insurance, the ALJ needed to deal with that subjective evidence and explain why he chose to reject it and still find Plaintiff capable of working from July 23, 2007, to July 2, 2010.

The ALJ dedicated almost none of his twelve-page decision to subjective evidence, other than in conclusory statements of disregard. For example, the ALJ noted only that Plaintiff told his doctor he had no headaches in April 2010 before summarily concluding that "the claimant may have some headaches from time to time," but the RFC's "postural and manipulative limitations would more than fully accommodate headaches and resultant pain." (R. at 89.) Yet he never explained how postural and manipulative limitations relate to headache pain and concentration issues. More importantly, he did not even recognize Plaintiff's testimony of "migraines" occurring up to three times per day, subjectively causing pain at a level ten out of ten until an hour after taking headache medicine. (R. at 33.) On remand, the ALJ must resolve the discrepancy between the conflicting objective and subjective evidence and explain why he chose to rely upon one over the other.

Similarly, the ALJ provided a lengthy summary of the objective medical evidence related to Plaintiff's alleged back and leg problems, but he failed to mention any subjective evidence other than a brief reference to Plaintiff's "self-report[ing of] some lower back and right leg pain after 'running up stairs,'" which landed him in the emergency room. (R. at 88–89, 407–420.) The

ALJ did not discuss Plaintiff's testimony of inability to sit for more than a half hour (R. at 30); stand still for more than fifteen minutes (R. at 38); walk more than a block, except with a shopping cart (R. at 30–31, 39); carry ten pounds while working on his feet for much of the day (R. at 39); sit through a television show without walking around (R. at 41–42); or kneel, squat, balance, bend to touch his toes, extend his arm past 110 degrees, or climb a flight of stairs (R. at 39–40). He also ignored Plaintiff's assertions of feeling a subjective ten out of ten in pain every day (R. at 29) and leg numbness and tingling 90% of the time (R. at 43). On remand, before "[o]bviously" concluding that "[a]ll of the foregoing *objective* evidence tends to call into severe question the credibility of the claimant's allegations of severe back issues, of severe resultant limitations, and of severe resultant pain/leg numbness" (R. at 89 (emphasis added)), the ALJ also needs to deal with the vast subjective evidence of Plaintiff's claimed back and leg problems.

However, as explained above, *see infra* at 15–16, the ALJ need not revisit Plaintiff's subjective complaints about depression because the ALJ substantially supported his decision to accommodate Plaintiff's concentration issues with the RFC determination of unskilled work (R. at 90). Likewise, the Court upholds the ALJ's credibility determinations on medication side effects, asthma and sinus problems, and gastroesophageal reflux disease because there was substantial evidence for disregarding their claimed severity. First, the ALJ noted that Plaintiff subjectively reported no medication side effects on three separate occasions (R. at 88–89, 205, 213, 222), in contrast with his attorney's assertions that he suffered from tiredness, migraines, headaches, dizziness, loss of balance, frequent urination, and achiness (R. at 614).

Second, in "question[ing] the credibility of the claimant's reports of severe asthma and sinus problems," the ALJ relied on the lack of breathing studies and two reports of clear-sounding lungs—objective medical evidence—but also on "mere medication management" of

the conditions (R. at 89), which Plaintiff confirmed in his testimony was the subjective extent of those problems (R. at 33–34). Third, the ALJ recognized that "the record does not reflect any resulting limitations from [gastroesophageal reflux disease], which appears to be relatively well-controlled by the claimant's medication," nor does it indicate "any Barrett's esophagus issues." (R. at 89.) Therefore, because the ALJ explained with substantial evidence why Plaintiff did not meet his burden of proving the existence, severity, and functional effects of these conditions, *see* 20 C.F.R. § 404.1512(c), they do not need to be addressed again on remand.

In summary, the ALJ's boilerplate credibility determination was unacceptable as to Plaintiff's headaches and back and leg problems because he failed to support those conclusions with substantial subjective evidence along with the stated objective evidence. However, this boilerplate language was appropriately supported with substantial subjective and objective evidence as to Plaintiff's depression, medication side effects, asthma and sinus problems, and gastroesophageal reflux disease. Therefore, on remand, the ALJ must fill in the explanatory gaps regarding Plaintiff's headaches and back and leg problems.

## F. Conclusion

The Court finds that the ALJ failed to build an accurate and logical bridge from the evidence to his conclusions, thereby precluding this Court from meaningfully reviewing the decision. The ALJ is directed to revisit his decision and fill in the missing explanations, as detailed above.

The Court remands this case to the Social Security Administration for further proceedings consistent with this Opinion.

SO ORDERED on June 13, 2013.

    S/ Joseph S. Van Bokkelen
JOSEPH S. VAN BOKKELEN
UNITED STATES DISTRICT JUDGE